JOHNNIE DRAKEFORD, Employee, Plaintiff v. CHARLOTTE EXPRESS, Employer, and NATIONAL UNION FIRE, Carrier, Defendants

No. COA02-510

(Filed 17 June 2003)

**Workers' Compensation— continuing disability—underlying cause**

The Court of Appeals affirmed an Industrial Commission decision terminating workers' compensation benefits based on a finding that plaintiff's back pain and disability were caused by a neurological disorder rather than a fall at work. Although plaintiff presented evidence to the contrary, the evidence in the record supports the Commission's findings, and the Commission is the sole judge of the weight and credibility of the evidence.

Appeal by plaintiff from opinion and award entered 9 October 2001 by the Industrial Commission. Heard in the Court of Appeals 29 January 2003.

*Johnnie J. Drakeford, plaintiff-appellant, pro se.*

*Pinto, Coates, Kyre & Brown, P.L.L.C., by Martha P. Brown, for defendant-appellees.*

HUDSON, Judge.

Plaintiff Johnnie Drakeford appeals an opinion and award entered 9 October 2001 by the North Carolina Industrial Commission that terminated his temporary total disability benefits. We affirm.

BACKGROUND

Plaintiff, who was employed as a driver/trainer for Charlotte Express, was in the course of driving a tractor-trailer when he stopped at a truck stop on 4 May 1995. On his way to the shower, he slipped on the wet floor and fell to the ground. He then felt pain in his neck and lower back. Charlotte Express and Charlotte Express's car-

rier, National Union Fire c/o Liberty Bell Agency ("defendants"), accepted compensability by paying benefits, without filing Form 21 or Form 60, and have paid plaintiff temporary total disability benefits since the date of the accident. Defendants filed a Form 24 on 6 August 1999, requesting that plaintiff's benefits be terminated on the grounds that plaintiff's current disability is the result of a non-work-related condition and is not caused or in any way related to his work-related injury sustained in May 1995. Special Deputy Commissioner Ronnie E. Rowell held an informal telephone hearing on 9 September 1999, after which he denied defendants' application for termination of benefits. Defendants then requested that the claim be assigned for hearing before the Industrial Commission.

The claim was heard 15 August 2000, and, in an opinion and award filed on 30 November 2000, Deputy Commissioner Pamela T. Young found that plaintiff's current condition was not caused by nor aggravated by the work-related injury of May 1995. The deputy commissioner also found that plaintiff's current medical condition and his disability were caused by a rare neurological disorder called Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP"), which pre-existed plaintiff's injuries that had resulted from the May 1995 fall. Accordingly, the deputy commissioner granted defendants' motion to terminate plaintiff's benefits.

In an opinion and award filed 9 October 2001, the Full Commission affirmed and adopted in whole the deputy commissioner's findings of fact, conclusions of law, and award. Plaintiff now appeals.

## BACKGROUND

Below are some of the facts found by the Full Commission:

1. At the time of the hearing before the Deputy Commissioner, plaintiff was 47 years old and employed as a truck driver by defendant-employer. Plaintiff began working for defendant-employer in 1993.

2. Prior to 4 May 1995, plaintiff had suffered back problems. In 1981, plaintiff reported that he sought medical care for persistent back problems. Again, in 1987, plaintiff suffered a back injury while lifting materials at work. He was taken out of work for a period of nine months, but did not undergo any type of surgical intervention.

3. On 4 May 1995, plaintiff was in the course of driving a tractor-trailer for defendant-employer when he stopped at a truck stop. On his way to the shower, plaintiff slipped on the wet floor and fell to the ground. Thereafter, he felt pain in his neck and lower back.

. . .

5. Plaintiff complained of neck and back pain after his injury. After plaintiff completed his truck route and returned home, he went to the emergency room at Moore Regional Hospital.

6. On 8 May 1995, plaintiff presented to his local primary care facility complaining of back and neck pain. Dr. Ed Carey examined plaintiff. Dr. Carey diagnosed plaintiff with lumbosacral strain and prescribed anti-inflammatory medication. Initially, plaintiff's condition seemed to improve.

7. Plaintiff was evaluated by Dr. Shupeck on 26 June 1995. Dr. Shupeck diagnosed plaintiff with musculoskeletal pain with multiple diffuse symptoms. He recommended that plaintiff undergo physical therapy to alleviate his symptoms. After a regime of physical therapy, Dr. Shupeck found that plaintiff still had residual back pain and give-way weakness in his right leg; however, plaintiff's neurological examination was stable and his strength intact. A bone scan performed on 18 August 1995 was normal. By 23 October 1995, plaintiff was improving. He was able to perform yard work without complaints of pain, able to walk long distances without any giving way of his right leg and able to drive for at least 45 minutes.

8. Sometime thereafter, plaintiff's condition deteriorated with plaintiff complaining of increased weakness in his right leg. Dr. Shupeck ordered a myelogram and CT scans to rule out any disc problems. These tests were unremarkable, indicating some degenerative changes but no herniated discs.

9. Plaintiff was referred to a neurologist for another opinion as to his condition. Dr. Bruce Solomon examined plaintiff on 13 December 1995. Dr. Solomon's examination of plaintiff was normal and he diagnosed plaintiff with chronic low back pain due to plaintiff's subjective complaints of back pain. Dr. Solomon noted that many of plaintiff's symptoms were not physiologic and recommended a neuropsychological examination. In Dr. Solomon's opinion, plaintiff's sensory examination did not follow any pat-

tern and his gait problems were clearly not typical of any neurological disease. Dr. Solomon ordered additional MRI's of the lower thoracic spine and lumbar spine for completeness, both of which were generally normal with mild degenerative changes.

10. Dr. Solomon referred plaintiff to the Fayetteville Pain Clinic for management of plaintiff's continued symptoms. Plaintiff was initially evaluated at the Cape Fear Valley Pain Management Center on 21 February 1996. At that time, it was noted that plaintiff complained of stiffness in his neck, give-way weakness in his right leg and weakness in his left arm. A plan was established in which plaintiff was to receive nerve block injections, trigger point injections and physical therapy.

11. Plaintiff underwent one series of nerve block injections and trigger point injections and although the Pain Clinic doctors recommended additional injections, plaintiff refused this treatment. On 26 November 1996, Dr. Kenneth Oswalt discharged plaintiff from the Pain Clinic, finding that plaintiff was "very functional" in spite of the pain. He further found that plaintiff had maximized his rehabilitation and had reached maximum medical improvement. Dr. Oswalt found no evidence of any functional disability or any permanent impairment.

12. On 27 February 1997, plaintiff returned to his family physician, Dr. Lam, for follow-up treatment and medication management. Dr. Lam continued to monitor plaintiff's condition, noting that his condition was generally unchanged during this period of time.

13. On 2 June 1998, plaintiff received an evaluation from Dr. Mark E. Brenner at the Pinehurst Surgical Center. Dr. Brenner found that plaintiff was exhibiting symptoms consistent with a myofascial pain syndrome. However, plaintiff's objective findings did not correlate with his subjective complaints. Dr. Brenner found that plaintiff was able to return to full-time work with some restrictions, specifically no lifting greater than 50 pounds and no bending, stooping, crawling and long distance truck driving. Dr. Brenner found that plaintiff had reached maximum medical improvement and that the objective findings from the examination did not support any permanent disability rating.

14. Plaintiff was also seen for an independent medical evaluation by Dr. Robert Elkins, an orthopaedic specialist, on 24 June 1999.

Dr. Elkins performed a complete physical examination on plaintiff and noted many instances of symptom magnification and pain accentuation. Based on his examination of plaintiff and the medical records which he reviewed, Dr. Elkins diagnosed plaintiff with low back pain by history, moderate symptom magnification and pain accentuation, probable malingering and a conversion reaction and/or psychophysiologic disorder. Dr. Elkins did not recommend any further treatment and could not find an orthopaedic basis for restricting plaintiff from further employment. Dr. Elkins also found that plaintiff's condition did not warrant any permanent disability rating.

15. Plaintiff was ultimately referred to and examined by Dr. David P. Fedder, an orthopaedic specialist, on 22 September 1998. At the time of this examination, plaintiff complained of give-way weakness in his right leg. Dr. Fedder ordered nerve conduction studies, EMG/NCV, in order to determine the cause for plaintiff's problems. These studies, which were performed on 26 October 1998, indicated evidence of an acquired sensory motor neuropathy with axonal and demyelinating features. Based on the results of this study, Dr. Fedder referred plaintiff to Dr. Henry Tellez, a neurologist.

16. Dr. Tellez began treating plaintiff on 4 December 1998. By examination and the performance of a series of laboratory work, Dr. Tellez diagnosed plaintiff with Chronic Inflammatory Demyelinating Polyneuropathy, CIDP, a neurological disorder which affect the nerves and causes damage not only to the nerves but also to their covering.

17. Dr. Tellez opined that CIDP is not associated with nor caused by trauma and that plaintiff's CIDP was not caused by plaintiff's work-related injury of 4 May 1995. Dr. Tellez further stated that CIDP cannot be aggravated or exacerbated by trauma and that plaintiff's fall in May 1995 was not a significant contributing factor to his current neurological condition, CIDP.

18. Plaintiff suffered from problems with pain and weakness in his lower extremities prior to his work related injury on 4 May 1995. Nine months prior to plaintiff's fall at work, plaintiff sought treatment from Dr. Lam for a balance and gait problem. At that time, plaintiff noted that his balance and gait were a life-long problem which had worsened within the past few months.

19. Plaintiff's CIDP pre-existed plaintiff's injuries suffered as a result of his fall on 4 May 1995. Plaintiff's current disability is caused by his neurological condition, CIDP.

20. The competent evidence in the record establishes that plaintiff no longer suffers from any condition which may be related to his fall of 4 May 1995. Plaintiff's continued complaints are related to his neurological condition, CIDP, and are not associated with any type of injury that may be related to his fall in May 1995.

21. Due to plaintiff's CIDP, permanent restrictions have been placed on his ability to work. These restrictions include: no working at heights, avoiding extreme changes in temperature, no prolonged standing, no stooping, no bending, light lifting, no skillful manipulations with fingers and hands, no commercial driving and no driving over two hours per day. Notwithstanding these restrictions, plaintiff is able to return to gainful employment.

The Full Commission concluded that plaintiff was not entitled to benefits and that:

1. Plaintiff suffers from a rare neurological disorder which has been diagnosed as Chronic Inflammatory Demyelinating Polyneuropathy (CIDP), and which pre-existed plaintiff's injuries suffered as a result of his fall on 4 May 1995. In the instant case, the competent evidence is insufficient to establish that plaintiff's current condition is related to any type of injury that plaintiff may have sustained related to his fall in May 1995. Plaintiff's fall in May 1995 was not a significant contributing factor to his current condition, nor did the fall aggravate or exacerbate plaintiff's condition; therefore, plaintiff is not entitled to continuing compensation under the Act. N.C. Gen. Stat. § 97-2.

2. Since no Industrial Commission Form 21 Agreement was entered into by the parties, plaintiff retains the burden of proving the nature and extent of his disability and that this disability is causally related to his work-related injury on 4 May 1995. However, plaintiff failed to carry his burden of proof in this case and therefore, he is not entitled to continuing benefits under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2.

Plaintiff now appeals.

## ANALYSIS

On appeal of a worker's compensation decision, we are "limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law." *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). An appellate court reviewing a worker's compensation claim "does not have the right to weigh the evidence and decide the issue on the basis of its weight. The court's duty goes no further than to determine whether the record contains any evidence tending to support the finding." *Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998) (citation and quotation marks omitted), *reh'g denied*, 350 N.C. 108, 532 S.E.2d 522 (1999). In reviewing the evidence, we are required, in accordance with the Supreme Court's mandate of liberal construction in favor of awarding benefits, to take the evidence "in the light most favorable to plaintiff." *Id.*

The Full Commission is the "sole judge of the weight and credibility of the evidence." *Deese*, 352 N.C. at 116, 530 S.E.2d at 553. Furthermore,

> the Commission does not have to explain its findings of fact by attempting to distinguish which evidence or witnesses it finds credible. Requiring the Commission to explain its credibility determination and allowing the Court of Appeals to review the Commission's explanation of those credibility determinations would be inconsistent with our legal system's tradition of not requiring the fact finder to explain why he or she believes one witness or another or believes one piece of evidence is more credible than another.

*Id.* at 116-17, 530 S.E.2d at 553.

Plaintiff argues that the Commission erred when it concluded that his May 1995 injury was not a significant contributing factor to his current condition and that the fall did not aggravate or exacerbate his condition. We disagree.

Here, the parties stipulated that plaintiff's injury was work-related. The primary issue before the Commission was whether plaintiff's compensable injury resulted in his continuing inability to earn wages. Plaintiff argued that it did, and defendant argued that any disability suffered by plaintiff was unrelated to his injury. Our courts have held that when a pre-existing, non-job-related disease or infir-

mity eventually causes an incapacity to work without any aggravation or acceleration of it by a compensable accident or by an occupational disease, the resulting incapacity so caused is not compensable. *Morrison v. Burlington Indus.*, 304 N.C. 1, 18, 282 S.E.2d 458, 470 (1981). Here, the Commission found that plaintiff suffered from a neurological disease, CIDP, that pre-existed his May 1995 fall but that his condition was not aggravated or affected by his injury. The Commission also found that plaintiff no longer suffers any effects from his accident and that his continued complaints are related to the neurological condition.

Although plaintiff presented evidence to the contrary, we conclude, after careful review, that evidence in the record supports the Commission's findings. First, three doctors—doctors Tellez, Elkins, and Lam—all agreed that CIDP is not associated with nor caused by trauma. As Dr. Tellez testified:

Q: Are you, Doctor, connecting his condition with the fall of 1995?

A: No ma'am.

Q: Okay. Okay. You are not—it is not your opinion that the fall caused Mr. Drakeford's condition, is it?

A: You're right, uh-huh.

Moreover, there was evidence to support the finding that plaintiff suffered from CIDP prior to the date of the work-related injury. The stipulated medical records indicate that plaintiff sought treatment from his family doctor nine months prior to his fall in May 1995. On 22 August 1994, Dr. Lam evaluated plaintiff for his complaints of unsteady balance and ataxic gait, symptoms of CIDP. Plaintiff described the problem as a life-long one that had worsened within the past few months.

Plaintiff also saw a neurologist, Dr. Malcolm Shupeck, for his continued complaints of pain. Many of the symptoms of which he complained—pain in the right leg, numbness in the right leg to the ankle, and weakness in the right leg—were symptoms associated with the as-yet-undiagnosed CIDP. In addition, several diagnostic tests were performed on plaintiff, all with negative results. A bone scan was performed in August 1995, which was normal. A myelogram was performed in November 1995—again, the results were normal. A post-myelogram CT scan of the lumbar spine and a CT scan of the

cervical spine were performed in November 1995. These too were essentially normal. An MRI of plaintiff's lower thoracic spine and lumbar spine, in December 1995, was normal, with the exception of some mild degenerative changes. An MRI of plaintiff's neck, in July 1997, was also normal with some degenerative changes noted.

The doctors and specialists who examined and treated plaintiff after his injury all failed to find any objective basis for plaintiff's complaints of neck and back pain. Dr. Solomon, who treated plaintiff from December 1995 through January 1996, found that plaintiff's examination was normal and that many of his symptoms were not physiologic in nature. Dr. Oswalt, who treated plaintiff from February 1996 through November 1996, found that plaintiff was "very functional" and that he had maximized his rehabilitation and showed no evidence of any functional impairment. Plaintiff was also seen by two orthopaedic specialists, Dr. Brenner in June 1998 and Dr. Elkins in 1999. Neither found any objective findings to support plaintiff's subjective complaints, and both agreed that plaintiff needed no further treatment from an orthopaedic standpoint. Dr. Brenner also opined that plaintiff had reached his pre-accident status at the time he examined him, in June 1998.

We do note that Dr. Lam testified that he believed that plaintiff suffered from mild degenerative disc disease and myofascial pain syndrome and that these conditions were either caused by or materially aggravated by plaintiff's accident. Dr. Lam is a family practitioner, however, and is not an orthopaedic doctor. Moreover, Dr. Elkins, who is certified in orthopaedics, disagreed with Dr. Lam's assessment. He did not find any indication that plaintiff suffered from either degenerative disc disease or myofascial pain syndrome:

Q: . . . Sir, we have taken the deposition of Dr. Lam in this matter, and Dr. Lam has diagnosed or has found that Mr. Drakeford had a degenerative disk disease. Did you find any indication that Mr. Drakeford had a degenerative disk disease?

A: No, but—I didn't find any evidence of degenerative disk disease, but everybody who drives a truck at his age has degenerative disk disease, including me and probably half the people at this table. So degenerative disk disease means that your disks are getting old. It doesn't necessarily mean that they are responsible for a problem.

Q: Did you find any—did you find that Mr. Drakeford had symptoms of degenerative disk disease?

The Full Commission chose to credit Dr. Elkins' testimony as opposed to that given by Dr. Lam. As indicated earlier, the Full Commission is the "sole judge of the weight and credibility of the evidence" and does not have to explain its findings of fact by attempting to distinguish which evidence or witnesses it finds credible. *Deese*, 352 N.C. at 116, 530 S.E.2d at 553. We conclude that ample evidence in the record supported the Commission's findings of fact.

Next, we examine whether the findings of fact support the Commission's conclusions of law. We believe that they do. Findings of fact numbers 2, 6, 7, 9, 13, 14, 16, 17, 18, 19, and 20, among others, specifically describe plaintiff's injury, his subsequent improvement, and his ongoing and pre-existing neurological condition. Thus, we reject plaintiff's argument.

CONCLUSION

For the reasons set forth above, we affirm the decision of the Industrial Commission.

Affirmed.

Judges MARTIN and STEELMAN concur.