FRANCES HUFFMAN, ROGER D. KENNEDY, MARILYN DAWN KIDD, THOMAS P. MARSH, FRANKIE McCASKILL, DEBORAH K. ROGERS, SHARON P. SCOTT, Employees, Plaintiff-Appellants v. MOORE COUNTY, Employer; SEDGWICK OF THE CAROLINAS, INC. Carrier, Defendant-Appellees

No. COA09-1324

(Filed 21 December 2010)

**1. Workers' Compensation— compliance with prior mandate—findings of fact**

The Industrial Commission did not err in a workers' compensation case by allegedly failing to comply with the Court of Appeals mandate in *Huffman* II. The Commission complied with the mandate by revising its findings of fact to avoid the noted deficiencies.

**2. Workers' Compensation— findings of fact—evidentiary support—test results**

The Industrial Commission did not err in a workers' compensation case by its findings of fact. Plaintiffs' challenge to the evidentiary support for the findings was an attack upon the relevance of the environmental testing results rather than an attack upon the accuracy of the Commission's description of the test results. It was the Commission's job to weigh the credibility of the evidence.

**3. Workers' Compensation— burden of proof—occupational disease—sufficient exposure to cause symptoms**

The Industrial Commission did not err in a workers' compensation case by allegedly utilizing an incorrect legal standard to determine whether the evidence concerning exposure to toxic or pathogenic substances sufficed to meet plaintiffs' burden of proof. Contrary to plaintiffs' assertion, the Commission did not require plaintiffs to prove the exact level of harmful chemicals to which they were exposed rather than simply requiring them to prove sufficient exposure to cause their symptoms.

**4. Workers' Compensation— occupational disease—expert witnesses—qualifications—credibility**

The Industrial Commission did not err in a workers' compensation case by relying on the expert testimony of two doctors that plaintiffs did not suffer from a compensable occupational dis-

ease. Both doctors were qualified as experts under N.C.G.S. § 8C-1, Rule 702 based upon their knowledge, skill, experience, training, or education. Further, it was the Commission's job to weigh the credibility of the evidence.

Appeal by Plaintiffs from Opinion and Award entered 20 April 2008 by the North Carolina Industrial Commission. Heard in the Court of Appeals 26 April 2010.

*Lennon & Camak, P.L.L.C., by George W. Lennon and Michael W. Bertics, for plaintiff-appellants.*

*Teague Campbell Dennis & Gorham, L.L.P., by George W. Dennis, III, and J. Matthew Little for defendants-appellees.*

ERVIN, Judge.

Plaintiffs appeal from an Opinion and Award entered by Chair Pamela T. Young and concurred in by Commissioners Dianne C. Sellers and Christopher Scott denying their request for workers' compensation benefits based on a determination that Plaintiffs had failed to establish that they contracted an occupational disease while working for Defendant Moore County. On appeal, Plaintiffs contend that the Commission failed to comply with the mandate issued by this Court in deciding a previous appeal, made factual findings that lacked adequate record support, applied an incorrect legal standard, and relied on incompetent medical testimony. After carefully considering Plaintiffs' challenges to the Commission's order in light of the record and the applicable law, we conclude that the Commission's order should be affirmed.

## I. Factual Background

### A. Substantive Facts

### 1. Design and History of the Community Services Building

Defendant Moore County converted the Community Services Building (CSB) into county employee offices after purchasing it from Ren Electronics in the late 1980s. A one story structure constructed on a concrete slab that initially featured fixed windows, the building originally utilized a septic system, components of which were located beneath the building. Use of the septic system was discontinued when the CSB was connected to a municipal water and sewer system several years before the County began using the building.

HUFFMAN v. MOORE CNTY.

[208 N.C. App. 471 (2010)]

Ren Electronics manufactured electrical wiring assemblies. According to Budd Hill Shirer, who worked for Ren Electronics at the CSB from 1980 until 1982, a large number of chemicals were used during the manufacturing process, including Trichloroethylene, Methyl Ethyly Ketone, Toluene, Krylon sprays, and various cleaning products. Mr. Shirer testified that there were "no procedures for proper handling of chemicals" and that, "at the end of the day, they were disposed of in floor drains, sinks, urinals, [and] toilets," all of which connected to the septic system, and "outside the doorway."

The heating, ventilating, and air conditioning system in the CSB was a closed loop. Open floor drains led to the septic system. The septic system vent went into the open area between the suspended tile ceiling and the roof instead of exiting the building. A stale smell reminiscent of sewage could be detected where the vent stack was located. The HVAC system did not have a fresh air return. On the contrary, "the air conditioner had a free return on it, so if any-any fumes or anything, it had to be pulling it through the air conditioner and blowing it right back out into the cubicles." According to Robert Lake, an HVAC technician, negative air pressure from the HVAC system could "draw stuff through the [septic] trap" into the CSB, and heat could evaporate the tanks in the septic tank vents so as to allow septic gas to pass without obstruction.

Robert Privott, a former County property manager, confirmed that pesticides had been sprayed in the CSB. Antex Exterminating had contracted with Defendant Moore County to apply pesticides in approximately 20 of the County's buildings on a monthly basis. Although the Antex-Moore County contract permitted the use of either safrotin or boric acid aerosols, Antex only used the former, which is approved for use in offices. In addition, Antex only used half the manufacturer's recommended concentration level.

## 2. Testing and Renovation Work at the CSB

In early June 1994, after complaints were made concerning air quality in the CSB, Sam Fields, supervisor of the Environmental Health Section of the Moore County Health Department, and Mr. Lake performed a walk-through of the building. Based on this inspection, Mr. Fields recommended that the building's air handling system be changed in order to increase the amount of fresh air introduced into the CSB. Carol T. Thomas, Defendant Moore County's General Services Coordinator, recommended on 15 June 1994 that "corrective measures . . . be implemented as soon as possible." On 20 June 1994,

Mr. Lake sent a memorandum to David McNeill, Jr., the County Manager, which explained the corrective measures as follows:

Remove[ed] condensate line from sewer vent and rerouted to the outside per code requirements.

Added supply vent to offices that did not have them, hallways and rest rooms.

Added return filter grills in hallways to facilitate regular filter changes.

Added fresh air intake louver from outside, added fresh air intake filter box to filter outside air.

Ran new duct work to supply fresh air to each system approximately 25% per system (500 CFM per unit).

On 21 June 1994, William J. Pate, an industrial hygiene consultant, conducted an air quality inspection in the CSB. At the time of his initial examination, Mr. Pate noted the presence of stained ceiling tiles, "indicating that there have been condensate or roof leaks," stained carpeting, and a floor drain covered with tape. Mr. Pate concluded that carbon dioxide levels in the CSB were 500 to 550 parts per million and noted that such levels should not exceed 1,000 parts per million. In addition, Mr. Pate detected carbon monoxide levels of 10 to 11 parts per million in the garage area; these readings slightly exceeded the EPA maximum level of 9 parts per million. However, Mr. Pate did not detect the presence of carbon monoxide outside the garage area. Mr. Pate did not detect elevated levels of air pollutants or identify any explanation for the symptoms reported by certain CSB-based employees. After completing his initial inspection, Mr. Pate recommended that Defendant take the following measures to improve the indoor air quality in the CSB:

Replace water stained ceiling tiles.

Clean or remove the carpet. Consider replacing the carpet with hard surface flooring especially in high traffic areas.

Remove the tape from the floor drain in the recreation department. Either permanently seal the drain or keep the drain filled with water.

. . . .

Minimize the use of pesticides. Use only when necessary. Application should be made by a licensed pesticide applicator.

Routinely inspect and clean cooling coils and condensate drain pans.

On 19 and 20 July 1994, the septic tanks associated with the CSB were drained and abandoned.[1] On 20 July 1994, Mr. Pate performed additional testing for the purpose of determining whether there were residual pesticide concentrations in the building's air and obtained results indicating that safrotin, dursban, chlordane, heptachlor and diazinon were not present and that volatile organic compounds were detected at levels lower than those deemed acceptable by the Occupational Safety and Health Administration and the American Conference of Governmental Industrial Hygienists.

More extensive testing of both soil and indoor air samples was performed by Acurex Environmental Corporation on 29 August 1994. Soil gas samples were collected at nine locations within the building, including six sites suspected of being above abandoned septic system lines. Two samples were collected from the soil beneath the concrete slab on which the CSB had been constructed at locations that were also believed to be above portions of the septic system. The soil gas samples targeted 72 volatile organic compounds for quantification; however, Acurex did not detect the presence of any of these compounds. Although carbon disulfide was detected in all samples, it was believed to be a "background contaminant." The amount of acetone and m- and p-xylene detected during the testing was "consistent with expectations" in light of the CSB's location. A number of identifiable volatile organic compounds were found in the indoor air samples tested by Acurex. However, the levels of each of these compounds were within the range of typical indoor measurements and consistent with those found in large buildings containing paint, carpeting, ceiling tiles, composite wood products, and various plastics.

On 2 August 1994, peppermint oil was poured into the sewer line clean out and the septic lines in order to determine if there were any leaks in the system. No odor of peppermint oil was detected inside the building, demonstrating that the septic system was removing air from the building. A similar test was performed on the three drain lines with the same result.

---

1. According to Philip Boles, Defendant County's Public Works Director, the draining process did not remove 100% of the material contained in the septic tanks, thus, "there would still have been some material present in those tanks."

On 9 September 1994, Flint Worrell, a waste management specialist with the Hazardous Waste Section of the North Carolina Department of Environment and Natural Resources, obtained soil samples from the trenches associated with the abandoned leach lines. According to Mr. Worrell, waste remnants may leach into the soil after filtering through the sewer system, and any massive accumulation of chemicals would have been visible in the drain line. However, test results revealed no indication of toxic substances. On 25 March 1996, Mr. Worrell removed sludge from the bottom of two of the three septic tanks, leading to the discovery of small quantities of barium and arsenic. The level of barium present in the septic tanks was "well below hazardous waste levels," and the detected level of arsenic was the "lowest level that the lab could identify." An additional sample taken six feet from the building, near the doorway, revealed the presence of low levels of barium. Because the substance levels detected did not constitute hazardous wastes, Mr. Worrell thought that it was unnecessary to abandon the septic tanks.

In a letter dated 26 October 1994, Mr. Pate informed Defendant that there was no need to routinely monitor methane in the building since the septic tank, which was the potential source for that substance, had been remediated and since the indoor air sampling performed by Acurex did not show the presence of methane. According to Mr. Pate, nothing in the indoor methane testing results created concern for the safety or health of the CSB's occupants. Neither Mr. Pate nor Acurex identified the presence of any factor that might explain Plaintiffs' symptoms.

### 3. Medical Evidence

All seven of the Plaintiffs worked for some period of time in the CSB, and each reported experiencing symptoms such as shortness of breath, fatigue, dizziness, sinus infections, musculoskeletal pain, headaches, and difficulty in concentrating. In addition, Plaintiff Thomas Marsh reported suffering from hives and swelling. Plaintiff Frankie McCaskill was a long-term cigarette smoker and had been treated for similar symptoms before working in the CSB. Similarly, Plaintiff Debbie Rogers' husband smoked cigarettes.

Plaintiffs sponsored the expert medical testimony of Dr. William Bell, a family physician practicing in Robbins, North Carolina, who examined and treated all of the Plaintiffs except Plaintiff Marsh; Dr. Charles Lapp, an internist and certified independent medical examiner who examined Plaintiffs Huffman, Scott, and Kidd; Dr. William

Meggs, a faculty member at East Carolina University Medical School who practices emergency medicine and toxicology at Pitt County Memorial Hospital and who examined and tested all seven Plaintiffs; and Dr. Robert Taylor, an otorhynolaryngologist who focuses on ear, nose and throat issues and allergies and who examined and treated Plaintiffs Scott, Huffman, and Rogers. Dr. Bell explained that, with the exception of Plaintiff McCaskill, none of the Plaintiffs had any history of chemical exposure or chronic long-term respiratory problems; that Plaintiffs' symptoms exist and are categorized as asthma and reactive airway disease; that it was unlikely that all of the Plaintiffs under his care would have developed similar symptoms without exposure to some common agent; and that it was unlikely that Plaintiffs' symptoms had a psychological origin. Dr. Lapp believed Plaintiffs to be suffering from irritant rhinosinusitis and reactive airway disease and opined that exposure to chemicals in the CSB substantially contributed to their symptoms, which he believed to be genuine. Dr. Lapp stated that Plaintiffs' symptoms were genuine, since their coughing and wheezing can be measured on pulmonary function tests, since examination reveals the presence of knots and tender points, and since they have balance difficulties and lightheadedness not found in others. Dr. Meggs testified that the results of certain tests, including rhinoscopies and nasal biopsies, were consistent with chemical exposure and that Plaintiffs' symptoms resulted, more likely than not, from their employment in the CSB and resulting exposure to substances, particularly pesticides. According to Dr. Taylor, the histories provided by Plaintiffs Scott, Huffman, and Rogers were consistent with chemical and pesticide exposure. In addition, Dr. Taylor indicated that exposure to pesticides and other chemicals, such as Tricholorethylene, Toluene, and Methyl Ethyl Ketone constituted significant or definite factors contributing to Plaintiffs' current symptoms.

On the other hand, Defendants presented the testimony of Dr. Staudenmeyer, a psychologist with the Behavioral Medicine and Biofeedback Clinic in Denver, Colorado, and Dr. John B. Whitfield, the head of the Division of Rheumatology and Immunology in the Department of Internal Medicine at the University of North Carolina School of Medicine. Both Dr. Staudenmeyer and Dr. Whitfield testified that, in their opinion, factors other than exposure to chemicals in the CSB caused Plaintiffs' symptoms, and criticized the methodologies employed by Dr. Lapp, Dr. Meggs, and Dr. Taylor as inconsistent with applicable scientific norms.

## B. Procedural Background

Plaintiffs filed timely claims seeking workers' compensation benefits on the grounds that they had contracted a compensable occupational disease in the course and scope of their employment with Defendant Moore County. Defendants denied each claim on the grounds that Plaintiffs had not contracted an occupational disease and that the condition upon which Plaintiffs predicated their claims was not employment-related. Plaintiffs' claims were consolidated for hearing and heard before Deputy Commissioner Chrystal R. Stanback on 22-24 August 2001. On 7 July 2004, Deputy Commissioner Stanback issued an Opinion and Award concluding that Plaintiffs' medical conditions were "compensable occupational diseases as defined under the Workers' Compensation Act" and that they were entitled to receive workers' compensation benefits. Defendants appealed Deputy Commissioner Stanback's order to the Commission.

On 25 October 2005, the Commission entered an Opinion and Award issued by Chair Young and joined by Commissioners Sellers and Scott concluding that "Plaintiffs . . . failed to establish that they suffer from an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13) and therefore [were] not entitled to benefits[.]" Plaintiffs noted an appeal to this Court from the Commission's order. On 19 June 2007, this Court filed an unpublished opinion remanding this case "for further findings" relating to the issue of spoliation. *Huffman v. Moore Cty.*, 184 N.C. App. 187, 645 S.E.2d 899 (2007) (*Huffman I*).

On 27 September 2007, the Commission entered an amended Opinion and Award issued by Chair Young, with Commissioners Sellers and Scott concurring, denying Plaintiffs' request for workers' compensation benefits on the grounds that "Plaintiffs have failed to prove that they suffer from an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13) and therefore are not entitled to benefits under the Act." Plaintiffs appealed to this Court from the Commission's remand order. By means of an opinion filed 16 December 2008, this Court remanded this case to the Commission to make "proper findings of fact." *Huffman v. Moore County*, 194 N.C. App. 352, 359, 669 S.E.2d 788, 793 (2008) (*Huffman II*).

On 17 December 2008, Defendants wrote the Commission to suggest that "the parties . . . submit proposed Opinions and Awards for its consideration." On 23 December 2008, Plaintiffs "request[ed] an opportunity to present an argument and answer any questions the

panel may have." On 4 February 2009, the Commission asked Defendants to "submit a proposed Opinion and Award supporting [their] position that reflects the concerns expressed by the Court of Appeals regarding clarification of the Findings of Fact." On 20 February 2009, Plaintiffs moved that the Commission judicially notice a study performed by "the Research Advisory Committee on Gulf War Veteran's Illnesses" and provide "an opportunity to [submit] . . . a brief and/or [provide] oral argument in support of their position." Two days later, Defendants objected to Plaintiffs' request that the Commission judicially notice the Research Advisory Committee study. On 25 February 2009, Defendants submitted the requested proposed order. Plaintiffs objected to certain of Defendants' proposed findings on 27 February 2009. Defendants responded to Plaintiffs' objections on the same date. By means of an Opinion and Award issued by Chair Young, with the concurrence of Commissioners Sellers and Scott, on 20 April 2009, the Commission denied Plaintiffs' motion and determined that "Plaintiffs [had] not established that their symptoms were caused by or significantly aggravated by their employment with Defendant-Employer." Plaintiffs appealed to this Court from the Commission's order.

## II. Legal Analysis

### A. Standard of Review

Plaintiffs' claims rest on the contention that each of them contracted a compensable occupational disease during their employment by Defendant Moore County. Since the occupational disease that Plaintiffs claim to have contracted is not one of those specifically enumerated in N.C. Gen. Stat. § 97-53, Plaintiffs had to prove that they suffered from "[a] disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53(13). "[T]here are three elements necessary to prove the existence of a compensable 'occupational disease:' (1) the disease must be characteristic of a trade or occupation, (2) the disease is not an ordinary disease of life to which the public is equally exposed outside of the employment, and (3) there must be proof of causation, *i.e.*, proof of a causal connection between the disease and the employment." *Hansel v. Sherman Textiles*, 304 N.C. 44, 52, 283 S.E.2d 101, 105-06 (1981) (citing *Booker v. Medical Center*, 297 N.C. 458, 468, 256 S.E.2d 189, 196 (1979)). The employee has the

burden of persuasion with respect to each element of a workers' compensation claim. *Holley v. ACTS, Inc.*, 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003) (stating that the "[p]laintiff has the burden to prove each element of compensability") (citing *Harvey v. Raleigh Police Dept*, 96 N.C. App. 28, 35, 384 S.E.2d 549, 553, *disc. review denied*, 325 N.C. 706, 388 S.E.2d 454 (1989), and *Taylor v. Twin City Club*, 260 N.C. 435, 437, 132 S.E.2d 865, 867 (1963)).

Appellate review in workers' compensation cases "is limited to a determination of (1) whether the Commission's findings of fact are supported by competent evidence, and (2) whether the conclusions of law are supported by the findings." *Snead v. Carolina Pre-Cast Concrete, Inc.*, 129 N.C. App. 331, 334, 499 S.E.2d 470, 472, *cert. denied*, 348 N.C. 501, 510 S.E.2d 656 (1998) (citing *Sidney v. Raleigh Paving & Patching*, 109 N.C. App. 254, 256, 426 S.E.2d 424, 426 (1993)). "[E]ven where there is evidence to support contrary findings, the Commission's findings of fact are conclusive on appeal if supported by any competent evidence." *Snead*, 120 N.C. App. at 335, 499 S.E.2d at 472 (citing *Watkins v. City of Asheville*, 99 N.C. App. 302, 303, 392 S.E.2d 754, 756, *disc. rev. denied*, 327 N.C. 488, 397 S.E.2d 238 (1990)). The "Commission is the sole judge of the credibility of the witnesses and the weight to be given to their testimony." *Russell v. Lowes Products Distribution*, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (citing *Anderson v. Motor Co.*, 233 N.C. 372, 376, 64 S.E.2d 265, 268 (1951)).

A different standard of review is, however, utilized in reviewing the Commission's decisions concerning legal issues. "The Commission's conclusions of law[, for example,] are reviewed *de novo*." *McRae v. Toastmaster, Inc.*, 358 N.C. 488, 496, 597 S.E.2d 695, 701 (2004). Furthermore, "[i]f the conclusions of the Commission are based upon a deficiency of evidence or misapprehension of the law, the case should be remanded so 'that the evidence may be considered in its true legal light.'" *Chambers v. Transit Mgmt.*, 360 N.C. 609, 611-12, 636 S.E.2d 553, 555 (2006) (quoting *Clark v. Wal-Mart*, 360 N.C. 41, 43, 619 S.E.2d 491, 492 (2005)). Finally, the extent to which expert testimony suffices to establish a disputed fact or component of a plaintiff's claim is also subject to *de novo* review. *Holley*, 357 N.C. at 233, 581 S.E.2d at 753 (stating that "a review of the expert testimony reveals that neither of plaintiff's physicians could establish the required causal connection between plaintiff's accident and her" condition).

## B. Discussion

## 1. Compliance with Prior Mandate

[1] First, Plaintiffs argue that the Commission erred by failing to comply with this Court's mandate in *Huffman II*. "Following an appeal to this Court if the case is remanded to the Commission, the full Commission must strictly follow this Court's mandate without variation or departure." *Crump v. Independence Nissan*, 112 N.C. App. 587, 590, 436 S.E.2d 589, 592 (1993). Plaintiffs contend that the Commission failed to honor our previous mandate when it (1) did not comply with Rule 702A of the Workers' Compensation Rules and otherwise deprived Plaintiffs of a right to be heard in the course of making its remand decision and (2) relied on a proposed Opinion and Award submitted by Defendants in drafting its order. After reviewing the record, we do not believe that the Commission engaged in an act of "judicial insubordination" as suggested by Plaintiffs.

According to Rule 702A of the Workers' Compensation Rules, when a case is remanded to the Commission from the appellate courts:

> each party may file a statement with the Full Commission, supported by a brief if appropriate, setting forth its position on the actions or proceedings, including evidentiary hearings or depositions, required to comply with the court's decision. This statement shall be filed within 30 days of the issuance of the court's mandate[.]

On 16 December 2008, we remanded this case to the Commission for "proper findings." On 17 December 2008, Defendants requested that both parties be allowed to submit proposed Opinions and Awards for the Commission's consideration. On 23 December 2008, Plaintiffs requested permission to present oral argument. The mandate in *Huffman II* was issued on 5 January 2009. N.C.R. App. P. 32(b). On 4 February 2009, the last day of the 30 day period specified in Rule 702A, the Commission requested Defendants to submit a proposed Opinion and Award. Over two weeks later, Plaintiffs requested that the Commission judicially notice the Research Advisory Committee study and asked for oral argument or the right to submit a brief. After the submission of Defendants' proposed Opinion and Award, Plaintiffs objected to certain of Defendants' proposed findings of fact. The Commission issued its Opinion and Award on 20 April 2009, approximately six weeks after the parties' last filing.[2]

---

2. In its second Opinion and Award on remand, the Commission specifically rejected Plaintiffs' request that the Research Advisory Committee report be judicially

The record clearly demonstrates that Plaintiffs did not file the statement and supporting brief permitted by Rule 702A within the required 30 day period and elected to seek oral argument before the Commission instead. Although Plaintiffs requested leave to submit an additional brief after the 30 day period specified in Rule 702A had already expired, the record is devoid of any Commission order prohibiting such a filing. Plaintiffs have not pointed to any authority establishing that they had a right to present oral argument in lieu of the statement and supporting brief maintained in Rule 702A. Had they taken advantage of the opportunities afforded by Rule 702A, Plaintiffs would have had ample opportunity to be heard on remand. Thus, Plaintiffs' explicit contention that the Commission violated Rule 702A and their implicit contention that the Commission deprived them of an adequate opportunity to be heard on remand both lack merit.

Secondly, even if the Commission did primarily rely on Defendants' proposed Opinion and Award in drafting its second order on remand, we do not believe that such an action would violate our mandate in *Huffman II*. We have previously held that "[i]t is acceptable for the deputy commissioner to request one side or the other to prepare the proposed opinion and award so long as the deputy commissioner has made his own decision and is free to ignore, amend, modify, etc., the draft," *Rierson v. Commercial Service, Inc.*, 116 N.C. App. 420, 422, 448 S.E.2d 285, 287 (1994), and that, "[w]here the trial court adopts verbatim a party's proposed findings of fact, those findings will be set aside on appeal only where there is no competent evidence in the record to support them." *Weston v. Carolina Medicorp, Inc.*, 102 N.C. App. 370, 381, 402 S.E.2d 653, 660, *disc. review denied*, 330 N.C. 123, 409 S.E.2d 611 (1991); *see also United Leasing Corp. v. Guthrie*, 192 N.C. App. 623, 633, 666 S.E.2d 504, 510 (2008). Thus, the fact that the Commission obtained a proposed Opinion and Award from Defendants and utilized it in drafting its order does not, standing alone, invalidate the Commission's decision.

Plaintiffs also suggest, without explicitly arguing, that the Commission erred by failing to reopen the evidentiary record. However, except for requesting the Commission to judicially notice the Research Advisory Committee report, Plaintiffs never described the additional evidence that they wished the Commission to receive.

---

noticed on the grounds that "[t]he materials submitted by Plaintiffs are the subject of dispute in the medical and scientific communities" and are "not the sort of evidence of which the Commission should take judicial notice." Plaintiffs have not challenged the Commission's refusal to judicially notice this report on appeal.

In *Huffman II*, we stated that "the Commission may, in its discretion, reopen the case for new evidence" given that, "in the intervening [ten] years [since the submission of Plaintiffs' original claims,] the medical community may have gained a greater understanding of [fibromyalgia and multiple chemical sensitivity.]" *Huffman II*, 194 N.C. App. at 359, 669 S.E.2d at 793. A discretionary decision by a trial court or administrative agency "may be reversed . . . only upon a showing that its actions are manifestly unsupported by reason." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). In view of the fact that Plaintiffs did not provide the Commission with any information concerning the additional evidence that they wished to present on remand except for their judicial notice request, we cannot say that the Commission abused its discretion by failing to reopen the evidentiary record.

At bottom, our remand instructions in *Huffman II* focused on the need for "proper findings of fact" which were "more than a mere summarization or recitation of the evidence." *Huffman II*, 194 N.C. App. at 355, 669 S.E.2d at 790 (quoting *Lane v. American Nat'l Can Co.*, 181 N.C. App. 527, 531, 640, S.E.2d 732, 735 (2007), *disc. review denied*, 362 N.C. 236, 659 S.E.2d 735 (2008)). A careful study of the second Opinion and Award on remand indicates that the Commission complied with our mandate by revising its findings of fact to avoid the deficiencies pointed out in *Huffman II*. As a result, we are not persuaded that the Commission failed to follow our mandate in *Huffman II*.

## 2. Evidentiary Support for Commission Findings

[2] Secondly, Plaintiffs contend that the Commission's findings of fact lack sufficient evidentiary support because they rely upon irrelevant test results. Although Plaintiffs specifically challenge Findings of Fact Nos. 12, 17, 26, 36, 37 and 106, they also state that "[d]iscussing each of the Findings of Fact imputing relevancy into defendants' environmental testing is not feasible within the space allowed." We do not find Plaintiffs' arguments to be persuasive.

The Commission stated in Finding of Fact No. 12 that:

On August 2, 1994, peppermint oil was poured into the sewer line clean out and vents to determine if there were any leaks in the septic system. During the test, no peppermint odor was detected inside the building. Mr. Boles opined and the Full Commission finds as fact that the lack of peppermint odor established that

there was positive pressure and that the sewer line was drawing air out of the building, not pushing it in. A similar experiment was conducted with the three drain lines. Again, there was no peppermint odor, which established that there was no negative pressure that would have sucked the oil in through the slab.

In contesting Finding of Fact No. 12, Plaintiffs argue that it "fails to recognize the HVAC was completely renovated from June 17 through June 20, 1994, to allow fresh air intake and eliminate the negative pressure problem."[3] Similarly, in Finding of Fact No. 17, the Commission found that:

> In his deposition testimony, Roy Fortmann, Ph.D., a senior scientist in indoor air quality research at Acurex Environmental, testified that volatile organic compounds were detected in the indoor air samples, but the specific types of compounds identified and the concentrations were what would be considered "typical" of indoor air in an office building. None of the volatile organic compounds present in the air sampling were in excess of the limits of OSHA or ACIGH. The Full Commission finds Dr. Fortmann's testimony to be credible and persuasive. The Full Commission further finds that the air in the CSB during the time Plaintiffs worked there was typical of indoor air in an office building.

In challenging this finding, Plaintiffs argue that, because Acurex did not inspect the building until after the renovations had been completed, Mr. Fortmann had "no way of knowing the air quality in the CSB . . . at the times the plaintiffs were working there" and that, despite having found Mr. Fortmann's testimony credible, the Commission had "stated a conclusion apparently based on his testimony **exactly opposite** his testimony" (emphasis in the original). In Finding of Fact No. 24, the Commission found that:

> On March 25, 1996, Flint Worrell, a waste management specialist from the North Carolina Department of Environment, Health and Natural Resources, conducted a sampling of two septic tanks and two soil samples from the area. The first sample consisted of soil and sludge taken from the bottom of the first septic tank. The second sample consisted of soil and sludge taken from the bottom of the

---

3. We have not, in our review of the material upon which Plaintiffs rely in support of this assertion, found any evidence tending to address the extent, if any, to which the modifications to the HVAC system in the CSB altered internal atmospheric pressures.

third septic tank. The third sample consisted of soil collected five feet from the building in front of the exterior doorway and the fourth was taken approximately six feet from the building. Tests were conducted for heavy metals, volatile organic chemicals, and semi-volatile organic chemicals. It would be likely to find some amount of chemicals inside a septic tank. The testing revealed that the concentration of chemicals was below hazardous waste levels. Accordingly, since the testing did not reveal hazardous waste, the abandoned septic tanks were not required to be removed. The third septic tank had previously been pumped out and filled with sand and was, therefore, not tested by Mr. Worrell.

According to Plaintiffs, "[t]his Finding fails to recognize the septic tanks had previously been pumped out and filled with sand."[4] Plaintiffs contend that "[t]his misunderstanding of the Full Commission culminates in Finding of Fact [No.] 26," in which the Commission found that:

No volatile organic compounds or other toxic or pathogenic substances were ever detected in the CSB at a level in excess of OSHA's permissible exposure limits or the ACIGH's threshold limits value. The Full Commission finds that no volatile organic compounds or other toxic or pathogenic substances were present in the CSB during the relevant time period at a level in excess of OSHA's permissible exposure limits or the ACIGH's threshold limits value.

Once again, Plaintiffs argue that, "[a]s recognized by Mr. Fortmann, the testing did not reflect the state of the CSB at the relevant points in time" and that "there is simply no evidence supporting the Commission's [finding] that there were no chemicals or other pathogenic substances at elevated levels during the relevant time periods." Finally, Plaintiffs point to Findings of Fact Nos. 36 and 37, in which the Commission stated that:

36. The environmental testing performed does not support Plaintiffs' allegations that they were victims of chemical exposure or that they were subjected to a greater risk of developing an occupational disease than the general public during their employment in the CSB.

---

4. Plaintiffs' argument overlooks the testimony of Mr. Boles, who clearly stated that the entire contents of those tanks had not been removed.

37. The competent and credible evidence of record fails to establish that there were toxic or pathogenic substances in the CSB at harmful or elevated levels. Therefore, since Plaintiffs were not subjected to an increased risk due to their employment with Defendant [Moore County], any diseases that Plaintiffs may have are not characteristic of and peculiar to their occupations.

According to Plaintiffs, these findings "clearly show [that] the . . . Commission believed the testing was relevant and [that P]laintiffs were not exposed to chemicals capable of causing their conditions." Thus, Plaintiffs' challenge to the evidentiary support for the enumerated findings is really an attack upon the relevance of the environmental testing results rather than an attack upon the accuracy of the Commission's description of the test results themselves.

A careful analysis of the record indicates that the Commission could appropriately conclude that the results of the testing performed at the CSB were not rendered irrelevant by the renovation work performed there. First, the record shows that the air quality testing performed in the CSB occurred when stained ceiling tiles and other allegedly contaminated items remained in the building and when pesticide spraying continued to occur. In fact, some of the renovations eventually made to the CSB stemmed from recommendations made by Mr. Pate at the time of his initial air quality testing. Secondly, despite Plaintiffs' repeated attacks upon the peppermint oil testing, the record contains no evidence tending to show that the renovations to the HVAC affected the extent to which negative air pressure in the CSB would have drawn air from the septic system back into the building. In the absence of such evidence, the Commission could have concluded that the results of the air quality testing were reflective of pre-renovation conditions. Thirdly, the record contains evidence tending to show that the soil in the leach lines and outside the building and a residue of the materials in the tested septic tanks had not been disturbed during the renovation process, rendering the testing performed upon those materials relevant to an analysis of pre-renovation conditions at the CSB. Finally, the record contains evidence tending to show that the pesticides utilized in the CSB were approved for interior use and were applied at concentrations lower than those approved for use inside buildings. Although Dr. Fortmann did note in his final report that there was "no way of knowing if there were any sources of chemicals, particulate matter, or microbiological organisms present prior to the renovations that may have caused the health-related problems in the

building," this evidence does not in any way negate, and instead actually supports, the Commission's finding that "[t]he environmental testing performed does not support Plaintiffs' allegations" and that "competent and credible evidence of record fails to establish that there were toxic or pathogenic substances in the CSB." Thus, the Commission's decision to rely on this evidence represents nothing more than a resolution of a weight and credibility issue that we are not authorized to disturb on appeal. Plaintiffs' challenge to the Commission's decision to rely on these test results lacks merit.[5]

### 3. Application of Incorrect Legal Standard

[3] Thirdly, Plaintiffs argue that the Commission utilized an incorrect legal standard in determining whether the evidence concerning their exposure to toxic or pathogenic substances in the CSB sufficed to meet their burden of proof. In essence, Plaintiffs claim that the Commission erroneously required them to prove the exact level of harmful chemicals to which they were exposed rather than simply requiring them to prove sufficient exposure to cause their symptoms. A careful review of the Commission's order demonstrates that the Commission did not impose an impermissible burden on Plaintiffs.

In support of this contention, Plaintiffs cite Findings of Fact Nos. 37 and 106, in which the Commission stated that:

37. The competent and credible evidence of record fails to establish that there were toxic or pathogenic substances in the CSB at harmful or elevated levels. Therefore, since Plaintiffs were not subjected to an increased risk due to their employment

---

5. Plaintiffs' argument that the Commission erred by failing to mention the testimony of witness Giles D. Hopkins in its order is equally without merit. The record and the Commission's order are replete with descriptions of the Plaintiffs' symptoms. Although the Commission may not discount competent evidence by failing to mention the competent testimony of an important witness in its order, *Sheehan v. Perry M. Alexander Constr. Co.*, 150 N.C. App. 506, 515, 563 S.E.2d 300, 306 (2002), the Commission "is not required to find facts as to all credible evidence," since such a "requirement would place an unreasonable burden on the Commission." *London v. Snak Time Catering, Inc.*, 136 N.C. App. 473, 476, 525 S.E.2d 203, 205 (2000) (citing *Woolard v. N.C. Dept. of Transportation*, 93 N.C. App. 214, 218, 377 S.E.2d 267, 269, *cert. denied*, 325 N.C. 230, 381 S.E.2d 792 (1989)). A careful review of the record suggests that Mr. Hopkins' testimony did not provide information that would have been of real significance to the Commission's determination of the extent, if any, to which Plaintiffs' symptoms resulted from exposure to chemicals occurring during the time that they worked in the CSB. In essence, a specific reference to Mr. Hopkins' testimony would have shown that an additional CSB-based employee claimed to have developed symptoms like those reported by the seven Plaintiffs. Despite Plaintiffs' contentions to the contrary, we are unable to see how this testimony would have materially altered the Commission's evaluation of Plaintiffs' claims.

with Defendant-employer, any diseases that Plaintiffs may have are not characteristic of and peculiar to their occupations.

. . . .

106. There is insufficient evidence regarding what, if any, exposure Plaintiffs may have had to chemicals, molds, or any other potentially toxic, harmful, or pathogenic matter while employed by Defendant-Employer, or that any alleged exposure aggravated any pre-existing condition. The medical and other evidence was insufficient to conclude that there is a causal connection between Plaintiffs' symptoms and their employment with Defendant-Employer.

Despite Plaintiffs' contentions to the contrary, these findings make no mention of any requirement that Plaintiffs demonstrate the existence of a specific, quantifiable level of exposure.

Establishing the existence of a compensable occupational disease necessarily requires proof that Plaintiffs were exposed to a level of toxic or pathogenic substances sufficient to cause the symptoms from which they suffer. For that reason, it logically follows that some threshold level of exposure must have occurred in order for a Plaintiff to prove that the hazards to which he or she was exposed exceeded those experienced by the public at large. *Gay-Hayes v. Tractor Supply Co.*, 170 N.C. App. 405, 408-09, 612 S.E.2d 399, 402, *disc. review denied*, 359 N.C. 851, 619 S.E.2d 505 (2005) (stating that "[o]ur courts have held that an individual's personal sensitivity to chemicals does not result in an occupational disease compensable under our workers' compensation scheme" and upholding a Commission finding that a plaintiff's personal sensitivities did not support a valid workers' compensation claim despite the fact that "plaintiff's employment with defendant, which stocked various chemicals, pesticides, and farming supplies, put her at a greater risk than members of the general public") (citing *Nix v. Collins & Aikman Co.*, 151 N.C. App. 438, 443-44, 566 S.E.2d 176, 180 (2002)). A careful review of the challenged findings establishes that they merely state that Plaintiffs did not satisfy their burden of proving that a sufficient level of employment-related exposure to toxic and pathogenic substances had occurred. Moreover, while Plaintiffs suggest that the testimony of Dr. Taylor, Dr. Meggs, Dr. Lapp, and Dr. Bell demonstrates the existence of the required level of exposure, this aspect of Plaintiffs' argument goes to the weight and credibility of the evidence, which is a determination to be made by the Commission,

rather than its sufficiency. *Adams v. AVX Corp.*, 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998) (stating that " '[t]he Industrial Commission is the sole judge of the credibility of the witnesses and the evidentiary weight to be given their testimony' ") (quoting *Anderson v. Construction Co.*, 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965)). Although the testimony of Dr. Bell, Dr. Lapp, Dr. Meggs, and Dr. Taylor is favorable to Plaintiffs' position, the record is devoid of evidence tending to show that toxic chemicals were introduced into the CSB septic system after 1982. Furthermore, the testing performed in the mid-1990s, which was properly available for the Commission's consideration, undercut the strength of Plaintiffs' claim. Given this set of circumstances, we conclude that the Commission did not err by requiring Plaintiffs to show that they were exposed to sufficient quantities of toxic or pathogenic substances during their employment with Defendant Moore County to cause the symptoms from which they suffered and determining that Plaintiffs failed to meet their burden of showing such a level of exposure.

#### 4. Reliance on Testimony of Defendants' Experts

[4] Finally, Plaintiffs contend that the Commission erred by relying on the expert testimony of Dr. Winfield and Dr. Staudenmayer to the effect that Plaintiffs did not suffer from a compensable occupational disease. According to Plaintiffs, the Commission erroneously accepted the opinions of Defendants' expert witnesses because their testimony addressed subjects outside their area of expertise and was based on an "assumption of facts that the record fails to support." We do not find Plaintiffs' argument persuasive.

Although Plaintiffs couch this argument as a challenge to the legal sufficiency of the testimony of Defendants' expert witnesses, it is better characterized as an attack upon the credibility of their testimony. As we have already noted, the Commission is required to make credibility judgments and must necessarily give greater weight to the testimony of some doctors as compared to others in deciding particular cases. *Hensley v. Industrial Maint. Overflow*, 166 N.C. App. 413, 420, 601 S.E.2d 893, 898 (2004), *disc. review denied*, 359 N.C. 631, 613 S.E.2d 690 (2005) (stating that "[t]he Commission was entitled to choose, as it did, to give greater weight to Dr. Griffin than Dr. Cappiello") (citing *Johnson v. Southern Tire Sales and Serv.*, 358 N.C. 701, 711, 599 S.E.2d 508, 515 (2004), and *Drakeford v. Charlotte Express*, 158 N.C. App. 432, 441, 581 S.E.2d 97, 103 (2003)). As long as an expert witness is qualified to render an opinion concerning the

subject at issue and bases his or her opinions on evidence properly contained in the record, *Thacker v. City of Winston-Salem*, 125 N.C. App. 671, 675, 482 S.E.2d 20, 23, *disc. review denied*, 346 N.C. 289, 487 S.E.2d 571 (1997) (holding that "evidence elicited by plaintiff's hypothetical question was not competent because it required Dr. de la Torre to assume the truth of facts that the record does not support"), the Commission is entitled to rely on that testimony in making its decision.

The record clearly supports the Commission's determination that Dr. Staudenmeyer and Dr. Winfield were qualified to testify concerning the causal relationship, if any, between Plaintiffs' work in the CSB and their symptoms. Although Plaintiffs challenge Dr. Winfield's qualifications to testify about this issue because he is "board certified only in internal medicine and practicing only in the fields of internal medicine and rheumatology" and argue that Dr. Staudenmayer "is a psychologist (who has had his license suspended)" and "not a medical doctor" or possessed of "expertise in medical toxicology or medical allergy and immunology," the record contains considerable evidence that tends to support a contrary determination. For example, Dr. Winfield has treated patients claiming to have been exposed to toxic or pathogenic substances and has published an article entitled "Psychologic Determinants of Fibromyalgia and Related Syndromes" in the *Current Review of Pain*, a peer-reviewed journal. In addition, Dr. Winfield extensively reviewed the research performed by leading medical organizations concerning the methodology adopted by Plaintiffs' experts and determined that position papers issued by various medical organizations had criticized their preferred approach. At the time of his deposition, Dr. Winfield was conducting a study of 400 fibromyalgia patients. Similarly, after obtaining his doctorate, Dr. Staudenmayer participated in a post-doctoral program housed at an institution that primarily serves as a respiratory illness center. Moreover, Dr. Staudenmayer has had 20 years of experience focused on research into psychosomatic and psychogenic illnesses allegedly relating to chemical and toxic agent exposure. Dr. Staudenmayer's work has been multidisciplinary in nature and has involved the preparation of articles; the writing of a book entitled *Environmental Illness, Myth and Reality*; and participation in a World Health Organization conference on multiple chemical sensitivity. As a result, the record clearly supports the Commission's determination that both Dr. Winfield and Dr. Staudenmayer, based upon their "knowledge, skill, experience, training, or education," N.C. Gen. Stat.

§ 8C-1, Rule 702, are "qualified as . . . expert[s] in the subject area about which [they testified.]" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 461, 597 S.E.2d 674, 688 (2004) (citing *State v. Goode*, 341 N.C. 513, 529, 461 S.E.2d 631, 640 (1995)).

In addition to challenging the credentials of Defendants' expert witnesses, Plaintiffs argue that the testimony of Dr. Winfield and Dr. Staudenmayer was incompetent because they both assumed that Plaintiffs were not exposed to chemical or pathogenic agents. As we understand Plaintiffs' argument, they contend that, because the test results were irrelevant and because Plaintiffs presented evidence tending to show the presence of certain substances in the CSB, the opinions of Dr. Winfield and Dr. Staudenmayer did not support a Commission determination contrary to the position espoused by Plaintiffs. We have already concluded that the Commission was entitled to consider the evidence relating to the testing performed in and around the CSB. Similarly, given the test results, the fact that Plaintiffs have not presented any evidence tending to show that any toxic or pathogenic elements were introduced into the CSB after 1982 except for certain pesticides, the fact that these pesticides were approved for indoor use and applied at lower concentrations than authorized by applicable standards, and the fact that the record contains no indication that the specific pesticides used in the CSB were capable of causing Plaintiffs' symptoms, we are not persuaded by Plaintiffs' challenge to the competency of the testimony of Defendants' experts.

Although both Plaintiffs and Defendants expended significant energy debating the positions taken by their respective experts, we see no need to address that topic in any detail. Reduced to its essence, the record reveals a sharp conflict in the evidence concerning the cause of Plaintiffs' symptoms, with one group of experts attributing those symptoms to employment-related exposure to toxic and pathogenic substances and the other group contending that Plaintiffs' symptoms were psychological in nature. After carefully reviewing the evidence, the Commission concluded that the testimony of Dr. Staudenmayer and Dr. Winfield was more credible than the testimony of Dr. Bell, Dr. Lapp, Dr. Meggs, and Dr. Taylor.[6] Such credibility judg-

6. In a related argument, Plaintiffs challenge the lawfulness of the Commission's decision not to credit the testimony of Dr. Taylor concerning pesticide exposure issues on the grounds that "[t]here is no competent medical evidence disputing Dr. Taylor's opinions on the admitted pesticide exposure and their ability to cause the plaintiffs' symptoms." However, given that Dr. Taylor had no information that any of the Plaintiffs

ments are the province of the Commission, not the appellate courts. As a result, Plaintiffs' challenge to the lawfulness of the Commission's decision to rely on the testimony of Defendants' experts lacks merit.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that all of Plaintiffs' challenges to the Commission's order lack merit. As a result, the Commission's order should be, and hereby is, affirmed.

AFFIRMED.

Chief Judge MARTIN and Judge JACKSON concur.

had ever complained of the symptoms of acute pesticide exposure, that he knew of no scientific studies concerning the effects of chronic pesticide exposure, and that his opinions concerning multiple chemical sensitivity and chronic fatigue syndrome represented a minority point of view, the Commission did not err by declining to credit his testimony.